FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

MAR 31 1997 CK

DAVID J. MALAND, CLERK

BY
DEPUTY Carolyn Kelley

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Petitioner, | ) |
| v. | ) C.A. No. 9:97CV 099 |
| CHEVRON USA, INC., and CHEVRON CORPORATION, | ) JUDGE ~~HANNAH~~ HEARTFIELD |
| Respondents. | ) |

MEMORANDUM OF THE UNITED STATES IN SUPPORT OF PETITION FOR
SUMMARY ENFORCEMENT OF INSPECTOR GENERAL SUBPOENAS

This is a summary proceeding filed by petitioner, the United States of America, to obtain judicial enforcement of administrative subpoenas issued by the United States Department of the Interior ("Interior" or "Department") Inspector General, pursuant to section 6(a)(4) of the Inspector General Act of 1978, 5 U.S.C. app. 3 § et seq. (1988). The subpoenas were issued to respondents, Chevron Corporation and its subsidiary, Chevron USA, Inc. (collectively "Chevron"), pursuant to an inquiry by the Inspector General into possible fraud and abuse in connection with payment of royalties to the United States since on or about 1986 for oil and gas produced on federal and Indian lands.[1] The subpoenas seek records that will assist the Inspector General in tracing the value Chevron received for its federal oil and gas

---

[1] Although respondents are separate corporations, they have acted as a single entity in regards to the subpoenas. For example, respondents are represented by the same counsel, and the protective orders submitted by respondents' counsel refer to the respondents collectively as "Chevron."

000022

production and in determining, inter alia, whether Chevron violated the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq., by misrepresenting and underpaying royalties owed on that production.

An administrative subpoena is summarily enforceable if the subpoena is within the agency's authority, it seeks information reasonably relevant to the agency's inquiry, and it is not indefinite or unduly burdensome.[2] As discussed below, the subpoenas issued to Chevron satisfy each of these requirements and summary enforcement of the subpoenas is therefore appropriate.

## STATUTORY FRAMEWORK

The Inspector General Act of 1978 (the "Act"), as amended, creates independent Inspectors General in federal agencies, who are responsible for overseeing the integrity of agency programs and the conduct of agency contractors and other recipients of agency funds. See 5 U.S.C. app. 3 § 1 et seq. (1988); Burlington Northern R.R. Co. v. Office of Inspector Gen., R.R. Retirement Bd., 983 F.2d 631, 634-35 (5th Cir. 1993); Adair v. Rose Law Firm, 867 F. Supp. 1111, 1115 (D.D.C. 1994). Under the Act, the Inspector General of the Department of the Interior is charged with the following duties and responsibilities:

---

[2] See, e.g., United States v. Morton Salt Co., 338 U.S. 632, 652 (1950); Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 214 (1946); NLRB v. Line, 50 F.3d 311, 314 (5th Cir. 1995); Burlington Northern R.R. Co. v. Office of Inspector Gen., R.R. Retirement Bd., 983 F.2d 631, 638 (5th Cir. 1993).

- 2 -

000023

-- to prevent and detect fraud and abuse in the Department's programs and operations. 5 U.S.C. app. 3 § 4(a)(3).

-- to conduct, supervise, and coordinate audits and investigations relating to the Department's programs and operations. Id. § 4(a)(1).

-- to help identify and prosecute those participating in defrauding Department programs. Id. § 4(a)(4)(B).

-- to identify deficiencies in the administration of Department programs and recommend corrective action. Id. § 4(a)(5).

-- to report to the Attorney General any possible violations of federal Criminal law that the Inspector General has discovered. Id. § 4(d).

So that she may carry out these statutory duties and responsibilities, the Act expressly confers upon the Inspector General broad subpoena power:

> In addition to the authority otherwise provided by this Act, each Inspector General, in carrying out the provisions of this Act, is authorized--* * * to require by subpena [sic] the production of all information, documents, reports, answers, records, accounts, papers, and other data and documentary evidence necessary in the performance of the functions assigned by this Act . . . .

Id. § 6(a)(4); see also Burlington Northern, 983 F.2d at 641 ("[T]he Inspector General Act of 1978 gives Inspectors General broad--not limited-- investigatory powers.") (emphasis in original). In the event of noncompliance, the subpoena is

- 3 -

000024

enforceable "by order of any appropriate United States district court." Id.

## BACKGROUND

The facts set forth below are summarized from the accompanying Declaration of Special Agent Lee A. Roark ("Roark Declaration"), which is attached to the United States' Petition for Summary Enforcement.

### A. Basis and Scope of the Subpoenas

Chevron is a major producer of oil and gas in the United States and owns numerous oil and gas leases on federal and Indian lands. Roark Decl. ¶ 3. Under the provisions of those leases, and applicable law and regulations, Chevron is obligated to pay to the United States royalties on the oil and gas produced from those leases. Id.

The value of oil and gas produced on federal land, for royalty purposes, is set forth in 30 C.F.R. Part 206. The regulations specify that the value of oil and gas sold under an arms length contract is "the gross proceeds accruing to the lessee for lease production." 30 C.F.R. §§ 206.102(h), 206.152(h), 206.153(h). Where the lessee's production is not disposed of by means of an arms length contract, or where such a contract does not reflect the reasonable value of that production, the regulations specify that the lessee's production is to be determined in accordance with certain "benchmarks" designed to replicate its "reasonable value." See id.

§§ 206.12(b)-(c), 206.152(b)-(c), 206.153(b)-(c). These benchmarks include posted prices, spot prices, and other comparable arms-length transactions. See id. §§ 206.12(c), 206.152(c), 206.153(c). The regulations make clear that, however the lessee's production is valued, "under no circumstances shall the value of production, for royalty purposes, be less than the gross proceeds accruing to the lessee." Id. § 206.12(h), 206.152(h), 206.153(h).[3]

Lessees are required to file with the Department's Minerals Management Service ("MMS") a monthly report (MMS Form 2014) concerning the lessee's oil and gas production for the preceding month. Roark Decl. ¶ 4. The report requires the lessee to state the value received for its production and the value used for calculating royalty payments. Id.

In 1996, the Inspector General, in conjunction with the Department of Justice, began investigating Chevron's payment of royalties to the United States on its federal lease production. Id. ¶ 5. Specifically, the Inspector General is investigating allegations that Chevron used a variety of schemes and arrangements -- including posted prices, sales to affiliated entities, aggregation of different types and volumes of production, and buy/sell, exchange, and overall balance

---

[3] MMS adopted the current regulatory scheme in 1988. Under MMS's prior regulations, the value of a lessee's federal lease production, for royalty purposes, was "the estimated reasonable value of the product as determined by the [MMS] Associate Director due consideration being given to the highest price paid . . . and to other relevant matters." 30 C.F.R. § 206.103 (1987).

agreements -- to misrepresent on monthly reports to MMS the value of federal lease production and the amount of royalties owed to the United States. Id. The Inspector General's investigation is independent of any audit or investigation of royalty payments that has been, or is being conducted, by MMS and is designed to detect fraud or abuse by Chevron. Id.

In order to investigate the foregoing allegations, on November 28, 1996, the Inspector General signed and issued a subpoena for records addressed to Chevron U.S.A., Inc. and a subpoena for records addressed to Chevron Corporation. Id. ¶ 6. Special Agent Gregory J. Johnson personally served the subpoenas on December 4, 1996. Id.

Each of the subpoenas includes twenty-four requests for documents, which fall into two general categories. Id. ¶ 7. The first category encompasses documents that will assist the Inspector General in tracing the value Chevron received for oil and gas produced on federal and Indian lands. Id. The documents in this category include (a) contracts or other documents describing arrangements by Chevron for the purchase, sale or transfer of oil and gas on federal leases; (b) financial statements, account ledgers and other documents summarizing Chevron's production, purchase, sale, or transfer of oil and gas on federal leases; and, (c) correspondence or other documents discussing differences in location or quality differentials, or the use of posted prices, futures contracts or other hedging

mechanisms, in connection with the purchase, sale, or transfer of oil and gas from fields containing federal leases. Id.

The second category of documents sought by the subpoenas relates to the policies, procedures, and methodologies used by Chevron to value and calculate royalty payments on oil and gas produced on federal lands. Id. The documents falling within this category include: (a) handbooks, manuals or other documents describing Chevron's procedures for valuing and calculating royalty payments on federal oil and gas production;

(b) handbooks, manuals or other documents discussing the determination and issuance of posted prices, and the relationship of such posted prices to the value of oil and gas produced on federal leases; (c) handbooks, manuals or other documents discussing methods other than posted prices for valuing oil and gas produced on federal leases; and, (d) correspondence, reports, or other documents discussing whether Chevron has properly calculated oil and gas royalties owed to the United States. Id.

B. <u>Chevron's Failure to Comply with the Subpoenas</u>

The subpoenas required Chevron to produce the documents by December 23, 1996. Id. ¶ 8. On December 16, 1996, the parties, through counsel, participated in a telephone conference to discuss Chevron's compliance with the subpoenas. Id. Chevron asserted that producing the requested information would be burdensome and expressed concern that the Inspector General subpoenas appeared to be seeking some documents previously

provided to MMS. Id. The parties eventually agreed that Chevron would give priority to oil-related documents and could produce documents in stages. It was further agreed that, during the first stage of production, Chevron would provide to the Government (i) the Chart of Accounts, (ii) memos relating to the use of posted prices for valuation determinations, (iii) materials previously produced in connection with MMS's investigation of royalty payments in California, and (iv) a list of contracts pertaining to Chevron's federal oil leases. Id. Chevron expressed concern about the need for a confidentiality agreement before producing these materials, and advised that it would prepare and provide the Government with a draft agreement. Id.

On January 31, 1997, the parties met, through counsel, to discuss further Chevron's compliance with the subpoenas. Id.

¶ 9. The Government advised that it had not received any documents from Chevron and inquired whether Chevron intended to comply. Id. Chevron claimed that it wanted to comply but again complained about the scope of the subpoenas. Id. The Government reiterated its proposal that Chevron give priority to oil-related documents and that it produce documents in stages. The Government requested that Chevron produce initially the documents that it offered to provide during the December 16 telephone conference, and agreed to work with Chevron to develop a plan for selecting and reviewing sample leases and lease-related documents during subsequent stages of production. Id. Chevron advised the

000029

Government that it would begin producing documents after a protective agreement was in place, and reiterated its promise to send the Government a draft agreement. Id. Government counsel furnished Chevron with a draft agreement and advised Chevron that the Government could not agree to substantive alterations to the draft. Id.

On February 17, 1997, counsel for Chevron faxed to the Government a proposed Confidentiality and Protective Agreement. Id. ¶ 10. The proposed Agreement was inconsistent in numerous respects with the framework for a protective agreement discussed by the parties at the January 31, 1997 meeting. Chevron's proposed Agreement, in part, prohibited any documents from being disclosed to other government law enforcement agencies without Chevron's consent; prohibited any documents from being disclosed to Congress unless Congress agreed to abide by the terms of the Agreement; prohibited any documents from being disclosed in response to a FOIA request; provided that all documents would remain in Chevron's custody and control; and required that Chevron be notified monthly of all persons having access to any of the documents. Id. These and other terms of the proposed Agreement would have unduly restricted the Government's ability to use the documents requested by the subpoenas. Id.

Counsel for the United States advised Chevron that the proposed protective agreement was unacceptable. Id. ¶ 11. Despite Chevron's representation that it would submit a revised protective agreement, a redraft submitted by Chevron on March 6,

000030

1997 contained the same restrictions that Government counsel had previously advised were unacceptable. Id. Although the subpoenas were issued more than three months ago, to date Chevron has not produced a single document. Id. ¶ 12.

DISCUSSION

The role of the district court in evaluating a request for enforcement of an administrative subpoena is "strictly limited." Sandsend Fin. Consultants. v. Federal Home Loan Bank Bd., 878 F.2d 875, 879 (5th Cir. 1989). The sole issue to be addressed by the court is whether "the court's process would or would not be abused by enforcement [of the subpoena]." SEC v. Wheeling-Pittsburgh Steel Corp., 648 F.2d 118, 125 (3d Cir. 1981). Enforcement is proper where the reviewing court determines that the inquiry is within the authority of the agency, the information sought is reasonably relevant to that inquiry, and the request is not indefinite or unduly burdensome. United States v. Morton Salt Co., 338 U.S. 632, 652 (1950); Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 214 (1946); NLRB v. Line, 50 F.3d 311, 314 (5th Cir. 1995); see Burlington Northern, 983 F.2d at 638 (applying standard to Inspector General subpoenas).

Enforcement proceedings necessarily must be limited in scope to protect "the important governmental interest in the expeditious investigation of possible unlawful activity." FTC v. Texaco, 555 F.2d 862, 871-72 (D.C. Cir. 1977) (citation omitted)

(en banc), cert. denied, 431 U.S. 974 (1977). "[T]he very backbone of an administrative agency's effectiveness in carrying out [it's] congressionally mandated duties . . . is the rapid exercise of the power to investigate . . .." Id. (quoting FMC v. Port of Seattle, 521 F.2d 431, 433 (9th Cir. 1975)). To ensure the summary nature of enforcement proceedings, the government is authorized to rely on affidavits or declarations to demonstrate that the requirements for enforcement of an administrative subpoena have been satisfied. In re EEOC, 709 F.2d 392, 400 (5th Cir. 1983). As demonstrated by the accompanying Roark Declaration, the requirements for summary enforcement of an administrative subpoena are clearly satisfied in this case.

A. The Subpoenas Are Within the Authority of the Inspector General

"An administrative agency's authority to request records and undertake other investigatory functions is extremely broad." Santa Fe Energy Products Co. v. McCutheon, 90 F.3d 409, 414 (10th Cir. 1996). As the Supreme Court has made clear, "law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest," even where the request is based on nothing more than "official curiosity." United States v. Morton Salt Co., 338 U.S. at 652. The authority issuing the administrative subpoena may "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." Id. at 642-43; see Oklahoma Press Publishing Co. v. Walling, 327 U.S. at 216; Perkins v. Endicott Johnson Corp., 128 F.2d 208, 214 (2d

Cir. 1942), aff'd, 317 U.S. 501 (1943). Accordingly, an administrative subpoena is proper if it relates to "any lawful" investigative purpose. United States EPA v. Alyeska Pipeline, 836 F.2d at 447 (citing Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 509 (1943)).

Once the court determines that an administrative subpoena is relevant to the issuing agency's investigative authority, the court's inquiry under the first criterion for summary enforcement of the subpoena is complete. Absent a specific showing that "the agency is acting in bad faith or for an improper purpose, such as harassment," the court may not inquire into the reasons for the agency's investigation or its request for particular information. United States v. Aero Mayflower Transit Co., 831 F.2d 1142, 1145 (D.C. Cir. 1987). Congress intended for the courts to give "deference to agency discretion" in determining whether and when to conduct an investigation or to issue a subpoena. United States v. Westinghouse Elec. Corp., 788 F.2d 164, 171 (3d Cir. 1986). Thus, "so long as [an Inspector General] subpoena is relevant to the Inspector General's function," the subpoena is valid and should be summarily enforced. Id.

Here, the subpoenas were issued pursuant to an investigation by the Inspector General, in conjunction with the Department of Justice, into allegations that Chevron employed a variety of schemes and arrangements to misrepresent to MMS the value of its federal oil and gas production used to calculate

000033

royalty payments. Roark Decl. ¶ 5. This investigation falls squarely within the Inspector General's express authority under the Inspector General Act to investigate fraud, waste, and abuse in the Department of the Interior's programs and operations, which include the management and collection of federal oil and gas royalties. Id. ¶ 2. Accordingly, the subpoenas addressed to Chevron clearly constitute lawful exercises of the Inspector General's statutory authority.

It is anticipated that Chevron may object to the subpoenas on the ground that they requests allegedly confidential material. However, the Inspector General's right to subpoenas documents is not affected by the fact that the requested material may include proprietary or confidential information. It is well-established that "the need for confidentiality is not a valid basis to refuse to comply with a subpoena," Equal Employment Opportunity Comm. v. C&P Telephone Co., 813 F. Supp. 874, 875 (D.C.D.C. 1993), and the courts have uniformly refused to modify an administrative subpoena on this ground, see University of Pennsylvania v. EEOC, 493 U.S. 182, 192 (1990); EEOC v. Associated Dry Goods Corp., 449 U.S. 590, 604 (1981).

The Government has been and remains willing to enter into a reasonable protective agreement with Chevron providing for adequate notice to Chevron prior to the release to a third party of any allegedly confidential information. To date, however, Chevron has rebuffed the Government's efforts to negotiate a reasonable protective agreement. Chevron has insisted that the

000034

Government accept the terms of its February 17, 1997 proposed Agreement, which, as explained in the Roark Declaration, would unduly interfere with the Government's ability to conduct its investigation. Roark Decl. ¶ 10; cf. Adair, 867 F. Supp. at 1121 (rejecting request for protective order that would "impermissibly interfere with the IG's discretion to conduct its investigation" and "to work with the [requested documents].") Chevron's refusal to modify its February 17 proposal evidences Chevron's failure to make a good faith effort to obtain a protective agreement, and strongly suggests that Chevron's asserted confidentiality concerns are merely part of its calculated efforts to delay compliance with the subpoenas. Id.

 B. The Materials Sought are Reasonably Relevant to the Inspector General's Investigation

In determining whether the information sought by an administrative subpoena is reasonably relevant to the agency's inquiry, the enforcing court must give wide latitude to the agency's initial determination. As one court observed,

> administrative investigatory subpoenas must by their very nature be broad. The agency need not narrow its focus from the beginning, and it is not for this court to determine whether the information sought is relevant to whatever eventual action the agency might take. This court may look only to the general purpose of the investigation and determine if the information sought, however broad, is relevant to that purpose.

United States v. Firestone Tire & Rubber Co., 455 F. Supp. 1072, 1083 (D.D.C. 1978).

In this case, the documents requested by the subpoenas are directly relevant to the Inspector General's investigation of Chevron. The Inspector General is seeking to determine whether Chevron engaged in fraud and abuse by misrepresenting and underpaying royalties on oil and gas produced on federal lands. Roark Decl. ¶¶ 5, 7. The subpoenas seek documents that will enable the Inspector General to trace how Chevron disposed of its federal lease production (whether through arms length agreements or non-arms length transfers), the actual value that Chevron received for that production, and the value that Chevron used in calculating and reporting its royalty obligations. Id. ¶ 7. This information clearly falls within, and is directly related to, the "general purpose of the [Inspector General's] investigation." Firestone Tire & Rubber Co., 455 F. Supp. at 1083.

C. The Subpoenas Are Not Indefinite or Unduly Burdensome

A subpoena is indefinite if it fails to provide a particularized description of the documents requested. See Oklahoma Press, 327 U.S. at 208. As noted, the subpoenas addressed to Chevron includes twenty-four separate requests for documents. Each of these requests seek narrowly defined categories of documents for specified time periods. The subpoenas therefore provides a particularized description of the requested documents and is not indefinite.

Nor do the subpoenas impose an undue burden on Chevron. "Broadness alone is not sufficient to refuse enforcement of a

subpoena." Texaco, 555 F.2d at 882. "[T]he question is whether the demand is unduly burdensome or unreasonably broad. Some burden on subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public interest." Id. To establish an undue burden, the recipient of the subpoena must show that the subpoena threatens to "unduly disrupt or seriously hinder normal [business] operations." Id.; see, e.g., SEC v. Savage, 513 F.2d 188, 189 (7th Cir. 1975); FTC v. Standard Amer., Inc., 306 F.2d 231, 235 (3d Cir. 1962). Chevron has not and cannot make any such showing in this case.

Moreover, Chevron has failed to make reasonable efforts to reach an agreement to reduce any asserted burden. See Morton Salt, 338 U.S. at 653 (in analyzing claim of undue burden court should determine whether respondent undertook "reasonable efforts" to "obtain reasonable conditions" for compliance). Chevron has not acted on the Government's proposal that Chevron limit its production initially to oil leases and that it produce the requested documents in stages. This proposal, which is set forth in detail in the Roark Declaration, would have significantly narrowed the documents initially to be produced by Chevron and alleviated any corresponding burden. See Roark Decl. ¶¶ 8-9.

Although Chevron has asserted that some of the documents sought by the subpoenas were previously made available to MMS auditors, this does not make the subpoenas unduly

- 16 -

000037

burdensome.[4] There is no arbitrary limit on the number of times that the Government may have access to a company's records. United States v. Thriftyman, Inc., 704 F.2d 1240, 1244 (Emer. Ct. App. 1983). Duplicate or overlapping requests are not prohibited unless it is demonstrated that the requests are "so 'unnecessarily duplicative' that it constitute[s] abuse, improper purpose, or bad faith." Id. at 1245.

No such abuse or bad faith is present here. Because MMS auditors did not copy many of the documents made available to them, the Inspector General cannot obtain the requested documents from MMS. Roark Decl. ¶ 13. Moreover, "a substantial part of the significance of materials is the condition in which they are maintained by the owner." United States v. Medic House, Inc., 736 F. Supp. 1531, 1536 (W.D. Miss. 1989). This consideration is particularly important where, as here, the subpoenaed materials are sought as part of an investigation involving allegations of fraud and abuse.

Accordingly, Chevron cannot sustain its burden of showing that the Inspector General subpoenas are unduly burdensome or unreasonably broad, and the subpoenas should be enforced in their entirety.

CONCLUSION

For the foregoing reasons, the United States

---

[4] To date, Chevron has failed to specify the claimed areas of overlap. Roark Decl. ¶ 13.

- 17 -

000038

respectfully requests this Court to summarily enforce the subpoenas issued to Chevron.

Respectfully submitted,

FRANK W. HUNGER
Assistant Attorney General

MIKE BRADFORD
United States Attorney

_____
O. KENNETH DODD
Assistant United States Attorney
Texas Bar No. 05931685
350 Magnolia Ave., Suite 150
Beaumont, TX. 77701
Tel. (409) 839-2538
Fax. (409) 839-2557

_____
MICHAEL F. HERTZ
ALAN KLEINBURD
DODGE WELLS
JOEL D. HESCH
MICHAEL D. GRANSTON
U.S. Department of Justice
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
Tel. (202) 307-0407

Attorneys for the United States

Dated: 3/28/97